# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

YOUSEF ELAMRI KADMIRI,
Plaintiff,

v.

MGM GRAND RESORTS INTERNATIONAL;

HENDERSON POLICE DEPARTMENT;
ALHAMBRA POLICE DEPARTMENT;
SAN BERNARDINO POLICE DEPARTMENT;
MONROVIA SHERIFF'S OFFICE;
MONROVIA POLICE DEPARTMENT;
ENNIS B JORDAN

ZINEB ELAMRI KADMIRI ;
LEILA TIJANIA KADMIRI;
BERKSHIRE HATHAWAY, INC.;
METROPOLITAN MECHANICAL;

CITY OF HENDERSON;
EARLSTONE COMMUNITY IN ANTHEM HENDERSON;
CITY OF ALHAMBRA;
CITY OF MONROVIA;
CITY OF SAN BERNARDINO;
CITY OF LOS ANGELES;
LOS ANGELES COUNTY JAIL;
HENDERSON CITY ATTORNEY;
HILTON RESORTS INTERNATIONAL;
HENDERSON HOSPITALS;

SPRING VALLEY HOSPITAL;
DESERT SPRINGS HOSPITAL;
SAINT ROSE HOSPITAL;
SUNRISE HOSPITAL;
HENDERSON FIRE DEPARTMENT;
ER AT SEVEN HILLS;
SAN BERNARDINO COUNTY RISK MANAGEMENT DIVISION;
ALHAMBRA COUNTY RISK MANAGEMENT DIVISION;
AMAZON, INC.;
JOHN DOE 1–100;
JANE DOE 1–100;

Defendants

# CASE NO. 2:25-CV-0514-APG- DJA

The Plaintiff respectfully seeks the court's approval for a First Amendment to the previously filed Complaint due to recent events that have complicated the documentation process. The Plaintiff has encountered significant health issues, distractions, and ongoing interference that hinder their ability to work efficiently. These challenges arise from various health concerns and ongoing controversies outlined in both this motion and the original pleadings. The Plaintiff emphasizes the urgent need for a federal investigation upon the court's directive and formally requests a judgment against the mentioned defendants.

FIRST AMENDED COMPLAINT

FOR DAMAGES, INJUNCTIVE, AND DECLARATORY RELIEF

(42 U.S.C. §§ 1983, 1985;

Bane Act; State Law Claims; California Tort Claims Act; Nevada Law)

"DEMAND FOR JURY TRIAL"

INTRODUCTION

Plaintiff, Yousef Elamri Kadmiri, brings this civil rights and tort action ...

This case arises from a prolonged, multi-jurisdictional conspiracy designed to destroy Plaintiff's health, reputation, property, livelihood, and access to the courts.

MGM Grand Resorts International acted as orchestrator, coordinating with police agencies, corporate partners, hospitals, and Plaintiff's own family to retaliate against his civil litigation.

**JURISDICTION AND VENUE**

This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a), and supplemental jurisdiction under 28 U.S.C. § 1367.

Venue is proper in this District under 28 U.S.C. § 1391(b) because substantial parts of the events occurred in Nevada.

**PARTIES**

Plaintiff: Yousef Elamri Kadmiri, resident of Henderson, Nevada.

Defendants include MGM Grand Resorts International, multiple municipal police departments, Zineb and Leila Kadmiri, Berkshire Hathaway, various hospitals, Hilton Resorts, Amazon, the Earlstone Community in Anthem Highlands, municipal entities, and Does 1-100.

**MUNICIPAL LIABILITY**

Cities of Henderson, Alhambra, Monrovia,

San Bernardino, and Los Angeles are liable under Monell for failure to supervise, train, and discipline officers.

and excessive force.

Municipalities ratified misconduct by ignoring unlawful arrests, bodycam deactivations,

Deliberate indifference resulted in systemic abuse of Plaintiff's rights.

**CAUSES OF ACTION**

Violation of 42 U.S.C. § 1983 – Unreasonable Seizure, Excessive Force, Retaliation.

Violation of 42 U.S.C. § 1985 – Conspiracy to Interfere with Civil Rights.

Violation of Bane Act – Cal. Civ. Code § 52.1.

False Arrest and Imprisonment.

Conversion and Trespass to Chattels.

Intentional Infliction of Emotional Distress.

Medical Negligence / Deliberate Indifference.

Negligent Supervision (Municipal Defendants).

DEFENDANTS AND RESPECTIVE ADDRESSES

· **MGM GRAND RESORTS INTERNATIONAL,** a Nevada corporation, principal place of business 3600 Las Vegas Blvd S, Las Vegas, NV 89109; private actor acting in conspiracy under color of law.
· **HENDERSON POLICE DEPARTMENT,** municipal agency, 223 Lead St, Henderson, NV 89015; acting under color of state law.
· **ALHAMBRA POLICE DEPARTMENT,** municipal agency, 211 S First St, Alhambra, CA 91801; acting under color of state law.
· **SAN BERNARDINO POLICE DEPARTMENT,** municipal agency, 710 N D St, San Bernardino, CA 92401; acting under color of state law.
· **MONROVIA SHERIFF'S OFFICE,** county law enforcement, 140 E Lime Ave, Monrovia, CA 91016; acting under color of state law.
· **MONROVIA POLICE DEPARTMENT,** municipal agency, 140 E Lime Ave, Monrovia, CA 91016; acting under color of state law.
· **ZINEB ELAMRI KADMIRI,** individual, 2701 King Claven Dr, Henderson, NV 89052; private actor acting in concert under color of law.
· **LEILA TIJANIA KADMIRI,** individual, presumed Henderson, NV; private actor acting in concert under color of law.
· **BERKSHIRE HATHAWAY, INC.,** Delaware corporation, 3555 Farnam St, Omaha, NE 68131; private actor acting in conspiracy.

· **METROPOLITAN MECHANICAL,** Nevada corporation (address pending); private actor acting in conspiracy.
· **CITY OF HENDERSON,** municipal entity, Henderson, NV; acting under color of state law.
· **EARLSTONE ESTATES AT ANTHEM (HOA),** gated community in Anthem, Henderson, NV 89044 (approximate) The Rivlin Group; private actor in concert under color of law.
· **CITY OF ALHAMBRA,** municipal corporation, Alhambra, CA; acting under color of state law.
· **CITY OF MONROVIA,** municipal corporation, Monrovia, CA; acting under color of state law.
· **CITY OF SAN BERNARDINO,** municipal corporation, San Bernardino, CA; acting under color of state law.
· **CITY OF LOS ANGELES,** municipal corporation, Los Angeles, CA; acting under color of state law.
· **LOS ANGELES COUNTY JAIL,** detention facility in Los Angeles County, CA; acting under color of state law.
· **HENDERSON CITY ATTORNEY,** municipal office, 240 S Water St, Henderson, NV; acting under color of state law.
· **HILTON RESORTS INTERNATIONAL,** Delaware corporation, 7930 Jones Branch Dr, McLean, VA 22102; private actor in conspiracy.
· **HENDERSON HOSPITAL,** medical facility, 1050 W Galleria Dr, Henderson, NV 89011 County OfficeHenderson Hospital; private actor in conspiracy under color of law.
· **SPRING VALLEY HOSPITAL MEDICAL CENTER,** 5400 S Rainbow Blvd, Las Vegas, NV 89118 County OfficeSpring Valley Hospital; private actor in conspiracy under color of law.
· **DESERT SPRINGS HOSPITAL,** 2075 E Flamingo Rd, Las Vegas, NV 89119 OpenNPIHealthcare4PPL; private actor in conspiracy under color of law.
· **SAINT ROSE DOMINICAN HOSPITALS – SIENA CAMPUS,** 3001 St Rose Pkwy, Henderson, NV 89052 Medicare ListHospitals Locator; private actor in conspiracy under color of law.
· **SUNRISE HOSPITAL,** (address not located); private actor in conspiracy under color of law.
· **ER AT SEVEN HILLS,** 4135 S Bruce St, Las Vegas, NV 89119 Valley Health SystemDesert Springs Hospital; private actor in conspiracy under color of law.
· **AMAZON, INC.,** Delaware corporation, 410 Terry Ave N, Seattle, WA 98109; private actor in conspiracy.
· **JOHN DOE 1–100,** individuals whose identities are unknown; private actors in conspiracy.
· **JANE DOE 1–100,** individuals whose identities are unknown; private actors in conspiracy.


I


II. FACTUAL ALLEGATIONS/ COMPLAINT DETAILS


A. **Orchestration by MGM Grand Resorts International — The Architect of the Stratagem**

Following Plaintiff's prior litigation against MGM Grand Resorts International ("MGM Grand"), the corporation assumed the role of central architect and coordinator of a multifaceted retaliation campaign.

reverse the litigation field by destroying Plaintiff's credibility through systematic defamation, harassment, and physical endangerment.

In pursuit of these goals, MGM Grand orchestrated a network of collaborators, including municipal police departments, corporate subsidiaries, private contractors, and community informants, each acting under color of law or corporate authority.

As part of this overarching scheme, false narratives were deliberately circulated through local and national media outlets, community rumor networks, and law enforcement bulletins — portraying Plaintiff as unstable, dangerous, or criminal. This preemptive framing was intended to undermine Plaintiff's testimony, poison the jury pool, and deter potential witnesses from providing truthful accounts supportive of Plaintiff.

-----------------------

### Financial Laundering Through Berkshire Hathaway

**On or about June 2025, Defendant Berkshire Hathaway, a multinational conglomerate, acquired a 4.1% equity stake in MGM Resorts International, a transaction that occurred in tandem with MGM's reported $45 million litigation settlement payout.**

Plaintiff alleges upon information and belief that this transaction was not merely an investment but functioned as a financial laundering conduit to funnel compensation and hush payments to

### Laundering of $45 Million Settlement Through Federal Court Data Breach Proceedings

participants in the conspiracy, including but not limited to Defendants Zineb Elamri Kadmiri and Leila Tijania Kadmiri. Leila Kadmiri, recieves funding through her fabricated protofolio, as an employee working for berkshire who at the same proximo proxima in timing that being this June 2025, became 4.1% share holder of MGM Grand Internationals stocks.

Defendant Leila Kadmiri And Zineb Kadmiri Work together in such a scheme potentially under duress, or by own free will to gain some monies from their participation stocks.

These financial arrangements enabled MGM to mask unlawful payments as legitimate market transactions, thereby maintaining the loyalty and silence of co-conspirators while concealing the illicit flow of funds from public and judicial scrutiny.

By using **Berkshire Hathaway's institutional structure,** Defendants created an appearance of legitimacy for transactions that, in reality, supported unlawful surveillance, harassment, and poisoning campaigns against Plaintiff.

Plaintiff alleges, upon information and belief, that the $45 million settlement payout associated with MGM Resorts International's 2025 federal data breach lawsuit was strategically manipulated and laundered through the federal court system itself.

The case in question, filed under the guise of a consumer class action arising from a cyber/data breach, was nominally brought by two lead plaintiffs, one of whom carried the surname Smallman. Plaintiff recognized this surname as familiar and directly connected to individuals and networks encountered in Nevada and California during the course of the broader retaliatory campaign.

Plaintiff observed and documented instances in which the name "**Smallman**" surfaced outside of litigation contexts, including:
  a. Being called out over a secure police-style **radio transmission, where a higher-ranking individual addressed "Smallman"** in a manner consistent with operational oversight;
  b. Being overheard in casual conversation at a coffee shop/restaurant platform, suggesting familiarity between conspirators and their use of public spaces as informal coordination points; and
  c. Connection to a tow truck company whose vehicles repeatedly appeared at multiple, geographically dispersed locations across Nevada and California, in direct correlation with Plaintiff's movements and vehicle seizures.

Plaintiff further alleges that another conspirator identified as "Uwing" was likewise overheard and observed in similar contexts, reinforcing the inference that named plaintiffs in the data breach suit were not independent litigants but planted operatives used to channel and legitimize the settlement.

Through this mechanism, Defendants used the federal judiciary and class action framework as a laundering instrument, disguising payments intended for bribery, hush agreements, and operational funding as lawful settlement distributions. The tactic simultaneously:
a. Provided a judicial imprimatur to shield unlawful payments from scrutiny;
b. Ensured that funds could be disbursed to operatives through the appearance of court-supervised relief; and
c. Obscured the connection between MGM's litigation liabilities and the ongoing campaign of harassment, surveillance, and poisoning directed against Plaintiff.

**Accordingly, Plaintiff asserts that the data breach settlement was not a bona fide judicial remedy for consumers, but a deliberately engineered financial laundering event that misused the authority of the federal courts to conceal racketeering activity and perpetuate a retaliatory enterprise targeting Plaintiff.**

-----------------------

### D. Chemical, Biological, and Psychological Warfare Against Plaintiff

Defendants Zineb Elamri Kadmiri and Leila Tijania Kadmiri, acting as informants and direct agents of MGM's strategy, deliberately exposed Plaintiff to biological and chemical toxins. These exposures were introduced into Plaintiff's food, clothing, vehicle, and living quarters, causing recurring parasitic infections, neurological distress, and cardiac irregularities.

Metropolitan Mechanical, acting under instruction from Defendants, covertly modified Plaintiff's vehicle exhaust and HVAC systems to disperse airborne chemical particulates. These particulates were designed to impair respiration, cognition, and cardiovascular stability, creating symptoms that mimicked psychosomatic illness and could later be dismissed by medical providers as delusional.

Defendant Hilton Resorts International permitted unauthorized access to Plaintiff's hotel rooms. During these intrusions, Defendants deposited contaminated materials and toxins, creating direct physical exposure risks while simultaneously eroding Plaintiff's ability to obtain safe housing.

The overarching purpose of this conFGduct was to advance MGM Grand's strategic objective: to discredit Plaintiff by inducing physiological symptoms that, when reported, would appear implausible or indicative of mental instability. This tactic sought to manufacture the appearance of psychiatric disorder, ensuring that Plaintiff's legitimate reports of poisoning and environmental sabotage would be disregarded by law enforcement, courts, and medical institutions.

-----------------------

### E. Police Escalations and Fabricated Arrests

On or about July 3, 2025, Plaintiff's lawful inquiry with San Bernardino County Animal Services was deliberately exploited to generate a false police report. This manufactured report triggered an armed police escalation by San Bernardino Police Department and Alhambra Police Department.

During this incident, Plaintiff was stopped at gunpoint, forcibly handcuffed, deprived of his phone, vehicle, and necessary medications, and then released without due process, charges, or judicial review.

Defendant Alhambra Police Department subsequently arrested Plaintiff regarding a safe that Plaintiff lawfully owned. Despite Plaintiff's valid ownership and supporting evidence, officers ignored exculpatory proof and unlawfully confiscated approximately $20,000 in tools.

Defendant Monrovia Sheriff's Office detained and physically assaulted Plaintiff for several days under a non-extraditable warrant, a legal impossibility. Plaintiff was then unlawfully transferred to Los Angeles County Jail, where he suffered further abuse and was denied access to court hearings in both Nevada and California, effectively obstructing justice.

Defendant Henderson Police Department engaged in separate coordinated acts of harassment. In multiple staged emergencies involving Plaintiff's relatives, officers disabled body cameras, and one sergeant was captured on video issuing the directive to "just pop him," evidencing intent to use deadly force against Plaintiff without lawful justification.

These fabricated arrests and escalations were not lawful police activity but part of a corporate-orchestrated campaign. They served to (a) terrorize Plaintiff, (b) strip him of property and evidence, and (c) construct a false criminal persona to discredit Plaintiff's legal claims and facilitate MGM Grand's escape from liability.

### F. Vehicle Seizures and Loss of Property

#### Coordinated and Statistically Improbable Stops

Plaintiff alleges that law enforcement agencies across Henderson, Nevada; San Bernardino, California; Alhambra, California; and Monrovia, California engaged in a deliberate pattern of unlawful vehicle seizures. These incidents were not random traffic enforcement but orchestrated interventions designed to deprive Plaintiff of mobility and escalate harassment.

Plaintiff was repeatedly stopped for the same alleged minor infractions—such as tinted windows or the absence of a front license plate—despite being in different jurisdictions and counties, often on the same day or within very short time intervals. When viewed against the statistical backdrop of national and state traffic enforcement data, the probability of such stops occurring randomly is vanishingly small.

According to U.S. Census-based transportation and traffic-stop data, only a minor fraction of all stops nationwide are initiated for window tint or plate-display issues. The chance that Plaintiff would be subjected to four separate stops across four counties for the same alleged violations within close temporal proximity represents an extraordinary statistical anomaly—a convergence so unlikely that it can only be rationally explained as intentional targeting.

Moreover, in each case, the original justification for the stop was quickly abandoned or contradicted by subsequent officer conduct. Officers pivoted from citing window tint or plate issues to searching for other pretexts, fabricating alleged safety risks or contraband concerns. This shifting rationale demonstrates that the stated cause of the stop was never the true motive, but rather a manufactured entry point into a campaign of intimidation.

#### Conflict of Stated Intent Across Jurisdictions

Notably, the four different counties involved—Henderson, San Bernardino, Alhambra, and

Monrovia—exhibited nearly identical patterns: an initial pretextual stop for a minor administrative matter, followed by a shift toward more serious accusations without valid cause. This uniformity across independent jurisdictions underscores coordination rather than coincidence.

The internal contradictions between the stated reasons for each stop and the officers' subsequent actions reveal the originating intent: to terrorize, incapacitate, and obstruct Plaintiff rather than to enforce traffic safety or law. The pattern of stops therefore cannot be explained by random probability, but only by systematic orchestration.

Loss of Medical Equipment, Evidence, and Survival Necessities
These seizures deprived Plaintiff of:

Medical equipment critical to managing a pre-existing cardiac condition;

Legal evidence essential for pending litigation, including recordings and digital files;

Personal survival items such as food, clothing, and shelter-related supplies.

Medical research confirms that patients with cardiac disease face exponentially higher risks of morbidity and mortality when denied immediate access to emergency transport. Defendants knowingly magnified Plaintiff's medical vulnerability by eliminating his autonomy over travel, effectively using medical dependency as a coercive weapon.

**Civil Rights and Constitutional Violations**
**These seizures violated Plaintiff's:**

Fourth Amendment rights against unreasonable search and seizure;

Fourteenth Amendment rights to due process and equal protection;

Fundamental right to travel, recognized by the Supreme Court in Saenz v. Roe, 526 U.S. 489 (1999); Kent v. Dulles, 357 U.S. 116 (1958); and Thompson v. Smith, 154 S.E. 579 (Va. 1930).

The statistical improbability of identical stops occurring across four jurisdictions in close succession makes clear that the events were not routine enforcement, but deliberate, retaliatory, and unconstitutional targeting.

Integration into the Broader Conspiracy
Plaintiff alleges these acts were carried out as part of a broader campaign orchestrated by MGM Resorts International and facilitated by Berkshire Hathaway, wherein local police agencies acted as agents of corporate harassment. By using fabricated traffic enforcement as a cover, Defendants sought to:

Immobilize Plaintiff and deprive him of autonomy;

Confiscate or obstruct access to evidence;

Create conditions of psychological terror through repeated confrontations.

Such conduct represents state-corporate collusion, where private actors manipulate law enforcement to serve retaliatory ends, undermining both constitutional liberties and the integrity of public institutions.

-----------------------

**G. Medical Negligence and Willful Indifference**

Plaintiff's Presenting Symptoms and Scientific Context
Plaintiff repeatedly presented with clear signs of serious medical distress—including
confusion, disorientation, cognitive impairment, fatigue, shortness of breath, tremors,
and cardiac irregularities—consistent with toxic exposures such as chemical agents,
organophosphate pesticides, and heavy metals.

Organophosphate poisoning is medically documented to cause confusion, ataxia, mental
disorientation, and cognitive impairment ScienceDirectCambridge University Press &
Assessment.

Chronic exposure to heavy metals—like lead, mercury, arsenic, or cadmium—can induce
memory loss, mood disorders, anxiety, depression, fatigue, and cognitive decline,
sometimes mimicking psychiatric illness musingsmemoirandmedicine.comPrime
ScholarsWikipedia.

Failure to Order Appropriate Diagnostic Testing
Despite these symptoms, Hospital Defendants deliberately refrained from ordering
critical diagnostic evaluations:

Blood toxicology panels (which would detect heavy metals, organophosphates, or other
toxins);

MRI or CT scans (to assess neurological damage);

Stool cultures or parasitological studies (to confirm parasitic infections).
These tests are standard of care under EMTALA, which mandates that patients with
emergency conditions receive stabilizing treatment. The failure to conduct them violated
both medical ethics and legal obligations.

Misdiagnosis, Premature Discharge, and Medical Fabrication
Rather than treating the symptoms, hospital staff routinely:

Misdiagnosed Plaintiff as having psychiatric or psychosomatic conditions, framing his
neurological symptoms as "in his head."

Prematurely discharged him without stabilization, worsening his condition.

Created a medical record suggesting unreliability or instability, which served as
documentation for third-party actors (hospitals themselves, law enforcement, media) to
wrongly portray Plaintiff as mentally unwell.

Intentional Coordination with Broader Conspiracy
Plaintiff alleges that this pattern of medical failure was not accidental but
orchestrated.

Hospitals aligned with law enforcement and MGM's corporate interests to obscure evidence
of poisoning, ensuring no objective medical record could contradict the defamatory
narratives.

These actions advanced the broader goal of undermining Plaintiff's credibility in legal
proceedings and reinforcing the misinformation spread through media and law enforcement
channels.

**Legal and Ethical Violations**
**The hospitals' conduct violated:**

EMTALA—requiring stabilization for emergency presentations;

Medical ethics, including the Hippocratic Oath and AMA Code (which demand patient welfare
as a priority);

Standard emergency protocols calling for toxicology and imaging in potential poisoning cases.

### Scientific Justification for Allegations

Organophosphate poisoning presents with neuropsychiatric symptoms—confusion, disorientation, ataxia—that are sometimes misinterpreted as psychosis Cambridge University Press & AssessmentWikipedia.

Chronic heavy-metal exposure is well-documented to cause cognitive dysfunction, mood disorders, fatigue, and even psychiatric symptoms like anxiety and depression musingsmemoirandmedicine.comPrime ScholarsWikipediaheavymetaldetox.org.

These facts strengthen the plausibility that symptoms were misdiagnosed not due to negligence alone, but as part of a deliberate narrative aimed at discrediting the Plaintiff.

### Defamation and Manipulation of Media

To amplify the campaign, MGM Resorts International — with financial backing and conduit support from Berkshire Hathaway — orchestrated defamatory media broadcasts and publications designed to portray Plaintiff as criminal, unstable, and untrustworthy.

Outlets such as the Las Vegas Review-Journal, Los Angeles Times, NBC, CBS, FOX, and local affiliates published stories echoing MGM's litigation narrative while omitting exculpatory facts.

Headlines and editorials labeled Plaintiff as a serial offender, a danger to the community, and a frivolous litigant, despite the absence of convictions or judicial findings.

MGM attorneys leaked filings and arrest records to the press, weaponizing federal court materials to contaminate public opinion.

Beyond national media, Anthem Highlands community members (John and Jane Does 1-50) were engaged as local propagandists:

They spread rumors on HOA bulletins, neighborhood watch lists, and private social media forums, falsely branding Plaintiff as threatening or unstable.

These narratives created an echo chamber where defamatory news coverage was repeated, exaggerated, and weaponized to isolate Plaintiff socially and intimidate him locally.

The purpose of this media manipulation was singular: to destroy Plaintiff's credibility so that when he sought redress in federal courts, he would already stand condemned in the court of public opinion.

-----------------------

### I. Concealment, Obstruction, and Continued Threats

Defendants further engaged in systematic concealment of evidence favorable to Plaintiff:

MGM and municipal defendants withheld surveillance footage, police records, and hotel keycard logs that would have exonerated Plaintiff and revealed the coordinated scheme.

Evidence of chemical and biological contamination was deliberately destroyed or misfiled by both hotel operators and cooperating hospitals.

Defendants also obstructed Plaintiff's judicial access:

In Los Angeles County jails, Plaintiff was denied access to court appearances and prevented from contacting counsel.

In Nevada, Plaintiff was subjected to fabricated charges that resulted in missed hearings and procedural dismissals of valid claims.

These obstructive measures were reinforced by continued threats and intimidation, including:

Harassment by police patrols near Plaintiff's residence.

Surveillance drones and electronic monitoring allegedly facilitated through Amazon and Metropolitan Mechanical, used to track Plaintiff's movements and communications.

Anonymous messages warning Plaintiff against continuing his lawsuits.

The ultimate intent of these acts was to silence Plaintiff permanently, reframe him as a criminal defendant rather than a victim, and ensure that MGM and its corporate and municipal allies could avoid accountability.

----------------------

**Dessemination of Defendant Roles**

MGM Resorts International – Architect and financier of the scheme; directed harassment, defamation, and concealment to retaliate against Plaintiff for 2019 litigation.

**Berkshire Hathaway – Financial conduit for laundering settlement funds**, bribing co-conspirators, and underwriting defamatory media.

**Zineb Elamri Kadmiri & Leila Tijania Kadmiri** – Relatives acting as informants; spread falsehoods, staged calls to police, and participated in poisoning attempts.

Municipal Defendants – City of Henderson (police/fire fabricated reports), City of Alhambra (false arrests, seizures), City of San Bernardino (armed detentions), City of Monrovia (wrongful detention/assault), City of Los Angeles (jail mistreatment, court denial).

Medical Defendants – Hospitals engaged in misdiagnosis, concealment of evidence, and willful denial of treatment.

Corporate Defendants – Metropolitan Mechanical (vehicle sabotage/HVAC poisoning), Hilton Resorts International (illegal room access/contamination), Amazon (surveillance facilitation).

Media Defendants – Major outlets and local affiliates publishing defamatory narratives.

Community Defendants (John and Jane Does 1–50) – Anthem Highlands residents engaged in stalking, rumor-spreading, and amplification of defamatory narratives.

**Defendants Zineb Elamri Kadmiri and Leila Tijania Kadmiri Seek Guardianship in Court Proceedings Presently to assist in the Furthering Of Attacks against Plaintiff.**

### FACTUAL ALLEGATIONS BRIEFING

Deliberate Use of News Outlets to Defame Plaintiff
Plaintiff alleges that MGM Resorts International, with the financial assistance of Berkshire Hathaway, deliberately manipulated media

#### Coordinated Action With Law Enforcement and Courts

Plaintiff alleges that Defendants Zineb Elamri Kadmiri and Leila Tijania Kadmiri, both residing at **2701 King Claven Drive, Henderson, NV 89044,** acted jointly and in active collaboration with local law enforcement agencies and court officials to orchestrate a campaign designed to strip Plaintiff of his autonomy, undermine his legal rights, and falsely portray him as incompetent.

#### Erroneous and Concealed Filings

On information and belief, Defendants prepared and/or facilitated the filing of errata and guardianship-related documents within the State of Nevada court system. These filings, which sought to impose a guardianship upon Plaintiff and to deprive him of his lawful driver's license, were never properly served upon Plaintiff in violation of both Nevada Rules of Civil Procedure and Plaintiff's due process rights under the Fourteenth Amendment. The concealment of these filings deprived Plaintiff of the opportunity to contest or respond, demonstrating intentional obstruction and fraud upon the court.

#### Malicious Intent to Restrict Plaintiff's Liberty

By advancing the false narrative that Plaintiff was incapable of managing his own affairs or safely operating a motor vehicle, Defendants attempted to generate a pretextual justification for law enforcement to continually detain, surveil, and harass Plaintiff during routine travel. This effort was calculated to:

Debilitate Plaintiff's ability to flee Las Vegas, where much of the underlying conspiracy was centered;

Reinforce the pretext for repeated vehicle stops, seizures, and detentions, under the guise that Plaintiff was not legally entitled to drive;

Undermine Plaintiff's credibility before courts, law enforcement, and community members by falsely casting him as unstable, impaired, or incompetent.

#### Unified Effort and Collusion

These coordinated actions by Zineb and Leila Kadmiri were not undertaken in isolation but were conducted in direct correlation with law enforcement agencies and other co-Defendants, thereby forming part of the broader conspiracy to obstruct Plaintiff's litigation efforts, restrict his movement, and inflict psychological, financial, and physical harm. The filings functioned as an administrative and judicial cover for what were, in substance, unlawful seizures and violations of Plaintiff's constitutional rights.

Request for Immediate Relief; Plaintiff Left Messages To Judge, and Counsel with No Resolve. Court Proceedings Might Be Fixed and Not F To Entertain Considering 3 Judges Whom were involved in Plaintiff's Criminal Case, and Civil Cases Were Either Enabled to Retire, and Or Recieved Promotions in Preceding Matter(s)

PX. FRAUDULENT GUARDIANSHIP FILINGS, JUDICIAL COMPROMISE, AND COLLUSION

**A. Coordinated Action With Law Enforcement and Courts**

Plaintiff alleges that Defendants **Zineb Elamri Kadmiri** and **Leila Tijania Kadmiri**, both residing at **2701 King Claven Drive, Henderson, NV 89044**, acted jointly and in active collaboration with law enforcement agencies, prosecutorial offices, and judicial officials to orchestrate a calculated scheme designed to strip Plaintiff of his autonomy, undermine his legal rights, and falsely portray him as incompetent.

**B. Erroneous and Concealed Filings**

On information and belief, Defendants facilitated the filing of **fraudulent guardianship-related pleadings and errata** within the Nevada court system. These documents were never properly served on Plaintiff, in direct violation of the **Nevada Rules of Civil Procedure** and Plaintiff's **Fourteenth Amendment right to due process**. The concealment of these filings deprived Plaintiff of notice and the opportunity to contest, amounting to **fraud upon the court.**

**C. Judicial Compromise and Pattern of Anomalies**

The guardianship fraud cannot be viewed in isolation but arises from a **longstanding pattern of judicial compromise and prosecutorial collusion** that has tainted Plaintiff's prior proceedings. Among the most egregious anomalies:

1. **Judge Jerome Tao** — After **redacting exculpatory contradictions from witness statements** and permitting a casino to justify its lack of surveillance by claiming that its cameras were merely "decoys" intended to deter crime but not operational, Judge Tao stripped Plaintiff of vital evidence necessary to his defense. Shortly thereafter, he was elevated to the **Nevada Supreme Court**, raising the strong inference of quid pro quo advancement.

2. **Judge Eric Johnson and Judge David Barker** — During Plaintiff's criminal sentencing, Judge Johnson sentenced an entire courtroom of defendants except Plaintiff. Then, in a highly irregular and unprecedented act, **Chief Judge David Barker physically tapped Judge Johnson on the shoulder, took the bench, and sentenced only Plaintiff** — imposing the maximum allowable sentence. This extraordinary departure from judicial procedure illustrates direct interference and collusion at the highest levels of the judiciary.

3. **Judge Kenneth Cory** — In Plaintiff's civil action, Judge Cory improperly entertained Defendants' motion to dismiss despite it not being served upon Plaintiff. Plaintiff had repeatedly filed memoranda and notices advising the Court of the impossibility of filing an opposition without service. Nonetheless, Judge Cory granted the motion, construing Plaintiff's lack of opposition as consent, and declaring the motion "meritorious." This procedural manipulation directly deprived Plaintiff of his constitutional right to be heard. Judge Cory was subsequently elevated to **Chief Judge,** further reflecting the appearance of impropriety and reward for participation in obstructive judicial conduct.

This pattern — where judges who issued rulings adverse to Plaintiff despite procedural and constitutional defects were shortly thereafter **promoted to higher judicial positions** — establishes a strong, reasonable inference that Plaintiff's cases have been compromised by **systematic bias, prosecutorial collusion, and judicial corruption.**

**D. Malicious Intent to Restrict Liberty**

The fraudulent guardianship filings mirror these prior anomalies. They advance the false narrative that Plaintiff is incapable of managing his affairs or driving lawfully, thereby serving as a fabricated pretext to:

· Restrict Plaintiff's freedom of movement and ability to travel;
· Justify repeated detentions, seizures, and harassment by law enforcement;
· Undermine Plaintiff's credibility in courts and community by falsely portraying him as incompetent.

**E. Unified Effort and Collusion**

The actions of Zineb and Leila Kadmiri were coordinated with law enforcement, prosecutorial agencies, and compromised judicial officers. Together, they form part of a **broader conspiracy** to obstruct Plaintiff's litigation efforts, silence his pursuit of justice, and inflict ongoing harm. The guardianship scheme functions as an administrative and judicial cover for **unlawful seizures and constitutional violations.**

**F. Request for Immediate Relief**

Plaintiff respectfully requests that this Court:

PATTERN AND PRACTICE OF JUDICIAL CORRUPTION AND COLLUSION

**(42 U.S.C. § 1983 – Deprivation of Constitutional Rights Under Color of State Law)**
**A. Legal Standard**

Section 1983 provides that any person who, under color of state law, deprives another of rights secured by the Constitution or federal law shall be liable to the injured party. While judges and prosecutors are ordinarily shielded by doctrines of judicial and prosecutorial immunity, those doctrines do not extend to acts taken in clear absence of jurisdiction, fraudulent concealment of material evidence, or collusive participation in a conspiracy to obstruct justice.

**B. Pattern of Judicial Compromise**

Plaintiff alleges that multiple judicial officers, in active coordination with law enforcement, prosecutors, and private Defendants, engaged in a **systematic pattern of rulings and procedural anomalies designed to deprive Plaintiff of his liberty, property, and constitutional rights.** This pattern is evidenced by:

1.  **Stay or suspend any guardianship proceedings in Nevada state court, including the hearing currently scheduled for September 2025,** until this Court has adjudicated the fraud and collusion alleged herein; and
2.  Issue **injunctive relief** preventing Defendants and their agents from pursuing guardianship or competency determinations against Plaintiff during the pendency of this federal action.

Proceeding with guardianship under these compromised conditions would irreparably prejudice Plaintiff's rights and perpetuate Defendants' malicious scheme, in violation of the **Fourteenth Amendment's due process protections** and the **integrity of the judicial system** itself.

outlets to spread false, defamatory, and calumnious statements regarding Plaintiff. These statements were strategically crafted and disseminated to further discredit Plaintiff's reputation, create the false appearance of criminality, and undermine his credibility in his pending and prior federal lawsuits.

National and local outlets, including but not limited to Las Vegas Review-Journal, Los Angeles Times, and syndicated broadcast affiliates (NBC, CBS, and FOX), ran coverage that portrayed Plaintiff as dangerous, mentally unstable, or criminally suspect.

These stories frequently omitted exculpatory facts, exaggerated incidents of police involvement, and mirrored talking points generated by MGM's corporate communications team, suggesting direct coordination between MGM and the press.

**Weaponization of Federal and State Court Filings**

Plaintiff further alleges that MGM used filings in federal litigation as both shield and sword, leveraging privileged litigation materials and selective leaks to fuel the media narrative. By doing so, MGM made its corporate positions in court simultaneously serve as defamatory talking points in the public sphere, effectively trying Plaintiff in the media while obstructing his legitimate access to justice.

MGM's attorneys and agents engaged in intentional leaks of pleadings, discovery disputes, and arrest records to media outlets that then broadcast Plaintiff's supposed wrongdoing.

These false narratives were amplified in headlines and news commentary, with phrases implying Plaintiff was a "serial offender," "unstable," or "litigation abuser," despite the absence of criminal convictions or judicial findings against him, OR that of convictions were falsified or fabricated, causing plaintiff to suffer from furthered damages through malicious prosecution, and loss of real first responders in las vegas Nv.

1.  **Judge Jerome Tao** — Redacted exculpatory contradictions in witness statements, allowed casino Defendants to justify lack of surveillance with "decoy cameras," and deprived Plaintiff of vital evidence. Shortly thereafter, Judge Tao was elevated to the **Nevada Supreme Court,** indicating advancement linked to rulings prejudicial to Plaintiff.
2.  **Judge Eric Johnson and Chief Judge David Barker** — At sentencing, Judge Johnson sentenced every defendant except Plaintiff. Then Chief Judge Barker abruptly intervened, removed Judge Johnson from the bench mid-hearing, and imposed the maximum sentence solely on Plaintiff. This unprecedented procedural manipulation demonstrates collusion and targeting.
3.  **Judge Kenneth Cory** — Improperly granted Defendants' motion to dismiss despite lack of service, after Plaintiff repeatedly notified the Court of his inability to oppose without service. Judge Cory construed Plaintiff's silence as consent and declared the motion "meritorious." He was subsequently promoted to **Chief Judge,**

again raising the appearance of quid pro quo.it is further the Plaintiff asserts that essentially the Courts intentional disregard to the Rules Of Civ Proc. In which plaintiff was denied his right to respond effectively formulate a pleading / rebuttal, or opposition to anything the defendant filed in which would be easily seen as an intentional omission to gain tactical advantage on an already disadvantaged plaintiff. Comes a time when someone asks how much can a willing person spend in regard to the destroying, defamation, and financial catastrophe caused irrevocably by the defendant's intricate workings.

4.  This results in a no doubt case in that the defendants MGM Grand Intern. Is the one who gains most from all three of those occurrences, given such filing of a Nun Pro Tunc would remedy the conformity of complaints dismissal violating N.R.C.P. By nullifying it, adding that such would if it were to be granted accordingly, plaintiff would literally be awarded up to 500,000,000.00 usd as to the suit resulting in essentially and rightfully a default. However since defendants bad acts were with malicious intent such right to challenge proceeding would be abnegated, due to defendant's entering into such a scheme to circumvent rules, causing disadvantages to be incurred by plaintiff, constitutes a forfeiture by wrong doing doctrine barring defendant from ever challenging default.

3.

## C. Collusion With Prosecutorial Offices
Prosecutorial officials were complicit in this scheme, as reflected by a series of **anomalies in Plaintiff's criminal case**, including:
·   Selective redactions of exculpatory evidence;
·   Strategic concealment of contradictions in witness testimony;
·   Alignment with judicial officers in pursuing maximum punishment against Plaintiff while ignoring procedural due process violations.
·   Both prosecutors worked in collusion to deprive, and abridge plaintiff from having a fair, and complete defense, and trial.

## D. Color of Law and Conspiracy
These acts were carried out **under color of state law** by judicial and prosecutorial officers acting outside the scope of legitimate jurisdiction, and in **concert with private Defendants** including Zineb and Leila Kadmiri, corporate Defendants (casinos), and law enforcement agencies. The result was a **concerted conspiracy** to:
·   Obstruct Plaintiff's access to the courts;
·   Falsify judicial records through concealment, redaction, and fraudulent pleadings;
·   Strip Plaintiff of exculpatory evidence and credibility;
·   Advance fraudulent guardianship proceedings to permanently impair Plaintiff's liberty.

## E. Continuing Practice
The same **characteristic traits of fraud and concealment** are now present in the **fraudulent guardianship filings** advanced by Defendants, which mirror earlier anomalies and serve as a continuation of the unlawful scheme. This establishes that Plaintiff is the target of an **ongoing pattern and practice** rather than isolated judicial error.

## F. Constitutional Violations
The acts described herein constitute violations of Plaintiff's:
·   **Fourteenth Amendment right to due process,** by depriving him of notice, fair hearings, and impartial adjudication;
·   **Fourth Amendment right to be free from unlawful seizure,** by justifying repeated detentions and vehicle seizures through fabricated incompetency claims;
·   **First Amendment right to petition the courts,** by obstructing Plaintiff's litigation efforts through collusion and fraudulent dismissals.

## COORDINATED ECONOMIC SABOTAGE BY MGM GRAND RESORTS INTERNATIONAL, LAW ENFORCEMENT, AND ALHAMBRA AUTHORITIES

1.  Plaintiff alleges that **MGM Grand Resorts International**, acting in coordination with **law enforcement entities** including Henderson Police Department, San Bernardino Police Department, and Alhambra Police Department, engaged in a **deliberate and systematic campaign of economic sabotage** designed to deprive Plaintiff of his livelihood, financial stability, and long-term ability to provide for his family.

2.  The first prong of this campaign occurred when, through collusion between MGM and law enforcement, Plaintiff was targeted at **Timely Testing**, his employment-related drug testing site. After consuming what Plaintiff later discovered to be **M&M candies laced with a sleep-inducing compound,** he was compelled to provide a diluted urine sample consisting primarily of water. Rather than being deemed

inconclusive, the test was fraudulently reported as showing **849 nanograms of amphetamines,** an impossible result under the circumstances. Plaintiff, at his own expense, ordered a second independent test for $185, which again returned manipulated and inconsistent results, proving tampering. The purpose and effect of these false positives was to **undermine Plaintiff's employment eligibility** and cut off his financial independence.

3. The second prong of this campaign was carried out by **Alhambra authorities,** who unlawfully seized and withheld Plaintiff's **specialized vehicle computer programming devices.** These devices, lawfully purchased with Plaintiff's savings, were essential to his professional work, entrepreneurial pursuits, and capacity to generate revenue. Their removal was not incidental but a **calculated deprivation:** Defendants knew these tools were the cornerstone of Plaintiff's ability to secure financing, build a business from scratch, and establish a stable financial future for himself, his daughter, and his grandsons. By stripping Plaintiff of these devices, Defendants ensured he could not recover economically after the employment sabotage.

4. Taken together, the fraudulent drug test sabotage and the calculated deprivation of Plaintiff's professional tools form a **single, coordinated strategy of economic destruction.** These acts were carefully orchestrated, interconnected, and carried out under color of law with the intent to: (a) obstruct Plaintiff's capacity to earn a livelihood; (b) destroy his professional reputation and employability; (c) prevent him from pursuing entrepreneurial ventures; and (d) impose long-term generational harm on his family.

5. Such deliberate and coordinated deprivation of Plaintiff's employment opportunities and professional property violates his rights under the **Fifth and Fourteenth Amendments,** and constitutes actionable misconduct under **42 U.S.C. § 1983.** Courts have recognized that targeted economic sabotage and deprivation of essential tools of livelihood by state actors or those acting in concert with them is a violation of due process and equal protection principles. See *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) (state deprivation of a protected interest without due process is unconstitutional); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (due process requires protection of livelihood interests); *Board of Regents v. Roth*, 408 U.S. 564 (1972) (recognizing protected liberty and property interests in employment opportunities).

6. By conspiring to weaponize fraudulent testing procedures while simultaneously stripping Plaintiff of the very tools necessary for his survival, Defendants engaged in **economic persecution under color of law.** These acts were not merely injurious — they were calculated to permanently cripple Plaintiff's capacity to function as a contributing citizen, entrepreneur, and provider.


Financial Conduits for Media Defamation

Plaintiff alleges that Berkshire Hathaway's covert financial role was not limited to laundering settlement money but extended to funding media platforms and cooperative journalists to publish and circulate defamatory narratives. These payments were disguised as advertising, promotional sponsorships, and public relations retainers, but were in reality hush-money and incentive payments for continued negative coverage.

For instance, sponsored stories and press releases disguised as journalism emerged immediately after Plaintiff's arrests, reinforcing the false image of criminality.

These defamatory media pieces were often syndicated across digital and television networks, ensuring Plaintiff's stigmatization was pervasive and enduring.

Community-Level Defamation in Anthem Highlands

In addition to national outlets, Plaintiff alleges that MGM, Berkshire Hathaway, and cooperating defendants recruited local participants in Anthem Highlands (a master-planned community in Henderson, Nevada) to act as informal defamation amplifiers.

These individuals — referred to here as John and Jane Does 1-50 — circulated false allegations within the neighborhood and local community groups, branding Plaintiff as a threat to safety and stability.

The defamatory narratives were spread via social media groups, HOA communications, and neighborhood watch forums, directly impacting Plaintiff's ability to reside peacefully in his community.

This local defamation campaign created a community echo chamber, where false narratives first planted by media outlets were repeated, exaggerated, and solidified into commonly accepted but false truths about Plaintiff's character.

Ultimate Defamatory Objective

The media manipulation strategy, coordinated across national outlets, federal litigation filings, and neighborhood-level amplification, was aimed at a singular outcome: to obliterate Plaintiff's credibility in court, the community, and society at large. By orchestrating this campaign of reputational destruction, MGM ensured that Plaintiff's legitimate grievances about false imprisonment, concealed evidence, and chemical/biological sabotage would be dismissed as fabrications of a discredited individual.

**Chronological Narrative of False Arrests, Police Escalations, and Coordinated Retaliation**

**A. Initial Henderson Police Orchestrated Emergencies**

Plaintiff alleges that the Henderson Police Department, in collusion with Plaintiff's relatives Zineb and Leila Kadmiri, initiated the earliest wave of fabricated "emergencies" against him.

These false reports resulted in repeated unwarranted police interventions, designed to destabilize Plaintiff's daily life, cast him in a false criminal light, and intimidate him into silence.

Plaintiff has direct recordings and evidence of Henderson officers intentionally disabling body cameras, evidencing an intent to conceal misconduct.

These events were not random; they were planned escalations coordinated with MGM's retaliatory scheme following Plaintiff's 2019 federal action concerning false imprisonment and evidence concealment.

-----------------------

B. Monrovia Sheriff's Office & Los Angeles County Jail – Prolonged Detention and Abuse
5. Plaintiff was subsequently detained by the Monrovia Sheriff's Office on the basis of a warrant unenforceable across state lines, making the detention legally void.
6. Despite this, Plaintiff was held for several days, subjected to physical abuse, mistreatment, and deprivation of rights, and ultimately transferred to Los Angeles County Jail.
7. At the Jail, Plaintiff was:

Prevented from attending court hearings in both Nevada and California;

Further subjected to coercive treatment meant to silence him;

Strategically incapacitated, ensuring that his ongoing litigation against MGM would be disrupted.

Plaintiff alleges this episode was deliberately engineered to obstruct justice and to create a false narrative of repeated arrests, reinforcing MGM's campaign to portray him as untrustworthy and criminal.

-----------------------

C. Renewed Henderson Police Escalations – Fabricated Incidents

9. Following Plaintiff's release, the Henderson Police Department resumed its campaign of harassment, again coordinating with family members Zineb and Leila Kadmiri to stage fabricated emergencies.

10. Officers repeatedly responded under false pretenses, furthering the narrative of Plaintiff as a public danger, despite no lawful basis.

11. Plaintiff alleges these actions were financially supported through diverted municipal funds, laundered as operational expenditures, and in part distributed to private operatives connected with the conspiracy.


----------------------


D. Henderson "Just Pop Him" Incident – Explicit Threat of Lethal Force, and Reveals a more sinsiter criminal intent.d

12. During one of these staged encounters in Henderson, a supervising sergeant was overheard instructing other officers to "just pop him."

13. Plaintiff reasonably interprets this statement as a direct order to apply lethal force, confirming the escalation from harassment and false arrests to an attempted extrajudicial killing.

14. The deliberate disabling of police body cameras during this incident underscores the consciousness of guilt and the illicit nature of the operation.

15. Plaintiff alleges that this incident represents the culmination of the conspiracy's objective: to neutralize Plaintiff permanently by either destroying his credibility or eliminating him physically.


----------------------


**Central Interrelations to MGM's Role ; THE PRINCIPAL ARTICTECT OF ENTIRE STARATAGEM, AND   SCHEME:**

MGM International orchestrated and financed these escalating events through a network of law enforcement collusion, family operatives, and municipal corruption.

Each escalation — from Henderson's staged emergencies, to Monrovia's unlawful imprisonment, to Henderson's explicit lethal threats — directly advanced MGM's ultimate retaliatory purpose:

To discredit Plaintiff's credibility in his 2019 civil lawsuit;

To fabricate a pattern of false arrests and instability;

To ensure Plaintiff's public reputation was destroyed and his litigation fatally undermined.

**C. Poisoning, Chemical, and Biological Attacks**

Plaintiff alleges that, in furtherance of the broader conspiracy orchestrated by MGM Resorts International, he was subjected to deliberate and repeated exposure to chemical, toxic, and biological agents. These exposures were carefully designed to impair his neurological, respiratory, and immune systems, while simultaneously creating observable symptoms that could later be mischaracterized as evidence of mental illness or instability.


----------------------

**1. Vehicular HVAC Tampering**

2. Defendant Metropolitan Mechanical, acting in collusion with other conspirators, modified the HVAC (Heating, Ventilation, and Air Conditioning) system of Plaintiff's vehicle.

Modern HVAC systems, if altered, can serve as a vector for chemical dispersal, introducing aerosolized particles or gaseous agents into the enclosed cabin environment.

Studies in environmental toxicology demonstrate that volatile organic compounds (VOCs), organophosphates, and heavy metal particulates can be introduced in trace amounts to cause confusion, dizziness, nausea, and cognitive dysfunction (consistent with Plaintiff's reported symptoms).

Such symptoms are clinically indistinguishable from neurological or psychiatric conditions without specialized toxicology screening, which Defendants knew would likely be withheld by complicit hospitals.

----------------------

**2. Hotel Room Intrusions and Biological Contamination**

3. Plaintiff further alleges that Hilton Resorts International permitted repeated, unauthorized entries into his hotel accommodations. During these entries:

Evidence indicates the presence of biological contamination, including parasitic material and bacterial residues consistent with intentional tampering.

Exposure to certain parasites, such as Toxoplasma gondii or intestinal helminths, is known to cause neurological and behavioral changes, including confusion, irritability, and fatigue.

Similarly, the introduction of mold spores, mycotoxins, or bacterial endotoxins into a living environment is scientifically documented to cause respiratory distress, memory impairment, and cognitive decline.

----------------------

**3. Symptomology and Mischaracterization**

4. As a direct result of these exposures, Plaintiff endured:

Confusion, disorientation, and cognitive fog, symptoms consistent with low-level chronic exposure to neurotoxic substances (e.g., carbon monoxide, organophosphates, or heavy metals).

Fatigue, muscular weakness, and immune suppression, which toxicologists recognize as hallmark effects of chronic chemical or parasitic exposure.

Perceptual disturbances that could easily be misrepresented as hallucinations by hostile parties, thereby fabricating a narrative of mental instability.

Plaintiff asserts that Defendants' strategy was twofold:

Physiological objective: to weaken his health and impair his ability to function normally, thereby disrupting his litigation and daily survival.

Psychological/legal objective: to create a medical paper trail suggesting psychiatric illness rather than toxic exposure, so that any claims Plaintiff made about misconduct could be dismissed as "delusional."

Medical Complicity in Cover-Up
Plaintiff further alleges that several hospitals and medical providers — whose identities will be disclosed during discovery — were complicit in this scheme. Their participation included:

Withholding toxicology screens that would have revealed exposure to heavy metals, pesticides, or industrial chemicals.

Misdiagnosing chemical poisoning as psychiatric disorders, in violation of diagnostic standards published by the World Health Organization (WHO) and the Centers for Disease Control and Prevention (CDC).

Altering or falsifying medical records to reinforce the false narrative that Plaintiff's symptoms were the product of delusion, rather than deliberate poisoning.

-----------------------

**Central Conspiracy Purpose**
These chemical and biological attacks were not random acts but part of a coordinated campaign engineered by MGM Resorts International and its co-conspirators. The intent was to:

Discredit Plaintiff's testimony in his 2019 federal action against MGM by painting him as mentally unstable;

Create a permanent cloud of stigma around Plaintiff, undermining his reputation in both legal and social contexts;

Physically incapacitate him so that he could not meaningfully pursue his claims, attend hearings, or defend himself from escalating false arrests and detentions.

-----------------------

**Scientific Basis for Allegations:**

Organophosphates (often used in pest control and industrial solvents) are documented to cause confusion, muscle weakness, and psychiatric-like symptoms.

Heavy metals such as lead, mercury, and arsenic cause long-term neurological damage and may mimic psychiatric disorders.

Biological contaminants (parasites, mycotoxins) are recognized to cause cognitive decline and behavioral changes, supporting Plaintiff's assertion that these exposures were designed to mimic mental illness.

-----------------------

**D. Pattern of Vehicle Seizures**

Authorities across multiple jurisdictions—including Henderson, Nevada; San Bernardino, California; Alhambra, California; and Monrovia, California—engaged in a deliberate and recurring pattern of unlawfully seizing Plaintiff's vehicles. These seizures were effectuated without probable cause, valid citation, or judicial authorization, in direct violation of the Fourth and Fourteenth Amendments to the United States Constitution.

Far from being isolated incidents, the frequency and timing of these vehicle confiscations establish a coordinated campaign rather than random enforcement. Statistically, the probability of Plaintiff being subjected to successive stops in four separate counties for minor or pretextual allegations—such as tinted windows or absence of a front license plate—is extraordinarily low when measured against the general census of traffic enforcement actions. The clustering of these stops, in close temporal and geographic proximity, renders the likelihood of coincidence negligible, thereby supporting Plaintiff's contention that Defendants acted in concert to terrorize, intimidate, and immobilize him.

Each seizure deprived Plaintiff not merely of transportation but also of essential property contained within the vehicles, including:

Life-sustaining medical supplies and equipment necessary for management of his cardiac condition;

Evidence relevant to ongoing litigation, such as legal documents, recordings, and electronic data storage devices;

Basic necessities for survival, including clothing, food, and shelter-related materials.

By stripping Plaintiff of these vital resources, Defendants constructively weaponized his medical vulnerability. Medical literature confirms that delays in access to emergency care—even 15-30 minutes—significantly increase the risk of permanent myocardial injury, arrhythmia, or sudden cardiac death in patients with pre-existing heart conditions. Defendants were aware of these medical realities and exploited them as part of a coercive campaign.

Furthermore, these actions demonstrate shifting and contradictory rationales: initial stops premised on window tint or plate infractions evolved into fabricated claims of unrelated violations or vague suspicions, revealing the absence of legitimate law enforcement objectives and instead exposing an intent to terrorize and suppress the Plaintiff.

**The repeated unlawful seizures and detentions:**

Violated Plaintiff's Fourth Amendment rights against unreasonable searches and seizures (see Soldal v. Cook County, 506 U.S. 56 (1992), recognizing seizures of property without due process as unconstitutional);

Violated Plaintiff's Fourteenth Amendment rights to due process and equal protection by denying hearings, notices, or lawful procedures before depriving him of property;

Interfered with Plaintiff's fundamental right to interstate travel (see Saenz v. Roe, 526 U.S. 489 (1999)); and

Reflected discriminatory and retaliatory targeting inconsistent with neutral law enforcement practices.

Accordingly, the pattern of vehicle seizures cannot be explained by neutral enforcement or coincidence but instead evidences a coordinated effort by law enforcement and corporate collaborators to destabilize Plaintiff, obstruct his litigation, and inflict psychological and physical harm.

----------------------

**E. THE JULY 3RD, 2025. EVENT SHOWS PROGRESSIVE BEHAVIOR WITH CRIMINAL INTENT**

**POLICE ESCALATION IN CONSPIRACY TO INCREASE STAKES.**

**Coordinated Scheme by Defendants – Theft of Plaintiff's Cat, Pretextual Shelter Cover-Up, and Orchestrated Arrest**

Plaintiff alleges that the theft of his cat, the subsequent concealment at the San Bernardino Animal Shelter, and the militarized police response were not isolated incidents, but rather part of a **deliberately orchestrated scheme involving multiple Defendants** acting in collusion under color of law.

On or about [insert date], members of the **Alhambra Police Department**, in concert with other law enforcement Defendants, unlawfully seized Plaintiff's domestic cat, an animal with unique identifiers. This seizure was not incidental, but was undertaken with the calculated purpose of destabilizing Plaintiff and forcing him into San Bernardino County, where further retaliatory actions awaited.

When Plaintiff attempted to locate his cat, San Bernardino Animal Shelter staff confirmed its presence but provided **irreconcilably conflicting stories** about its intake:

1. That it had been surrendered by "a couple";
2. That it had been confiscated from "an elderly deceased woman";
3. That it had been seized from "a jailed man."

These contradictory accounts cannot coexist and instead serve as clear **pretextual cover-ups** designed to conceal the true source of the cat's unlawful removal — law enforcement. The conflicting narratives themselves, when placed alongside the timing of subsequent events, are irrefutable evidence of a **deliberate and malicious conspiracy**.

The scheme was further exposed when, after Plaintiff questioned shelter staff, the manager abruptly summoned police by calling a direct line and stating only: "*He's here, come get him fast.*" This phrase, devoid of any description of a crime or legal basis for intervention, unmistakably demonstrates that the police response had been **prearranged** and that Defendants were acting in **collusion**. Plaintiff asserts that review of the 911 call logs and dispatch recordings from that date will confirm the absence of a legitimate criminal complaint, proving that the call was a coordinated trigger to mobilize police against him.

Within one minute of this coded summoning, a police helicopter was deployed overhead, and heavily armed officers converged, stopping Plaintiff at gunpoint, subjecting him to excessive force, and effectuating an arrest on a mere cite-and-release basis. His release was intentionally delayed until late at night, ensuring he could not remain in San Bernardino to recover his unlawfully seized vehicle. When Plaintiff attempted to locate his vehicle, both the police and local towing companies **denied knowledge**, deliberately concealing its whereabouts and sending Plaintiff on a manufactured "wild goose chase."

These events, taken together, show that Defendants — including the Alhambra Police Department, San Bernardino Police Department, San Bernardino Animal Shelter, and others acting under the influence of cooperating municipal, corporate, and private parties — executed a **calculated and malicious scheme** to deprive Plaintiff of property, liberty, and livelihood. The unlawful seizure of Plaintiff's cat, the pretextual shelter fabrications, the coded summoning of militarized police, the excessive-force arrest, and the concealment of his vehicle were all **steps in a single coordinated plan**, designed to harass, destabilize, and economically cripple Plaintiff.

This pattern of conduct constitutes a violation of Plaintiff's **Fourth Amendment rights against unlawful seizure and excessive force**, and his **Fourteenth Amendment rights to due process and equal protection**, actionable under **42 U.S.C. § 1983**. The theft of Plaintiff's cat — a deeply personal and emotional loss — was not incidental, but rather a calculated instrument of harassment undertaken with malicious intent by Defendants acting in joint conspiracy.

**F. Medical Negligence and Deliberate Indifference (Explained with Science References)**

To date, the Plaintiff has been systematically denied standard diagnostic procedures that are universally recognized in medical practice for the evaluation of suspected parasitic infection and chemical-related injury. Despite repeated requests, no medical facility has performed stool ova-and-parasite (O&P) examinations, antigen assays, or polymerase chain reaction (PCR) panels—tests which are specifically recommended by the U.S. Centers for

Disease Control and Prevention (CDC) as the primary diagnostic tools in suspected parasitic disease cases (CDC, Parasites – Diagnostic Procedures for Stool Specimens). Instead of ordering these inexpensive, non-invasive tests, hospital staff discharged Plaintiff or redirected his complaints toward psychiatric holds and sedation.

Similarly, Plaintiff has been denied contrast-enhanced CT or MRI imaging, even though contrast media is the recognized gold standard for evaluating suspected infections, vascular anomalies, or parasitic migration through tissue. According to the American College of Radiology (ACR) Appropriateness Criteria, the administration of contrast agents (iodine-based for CT and gadolinium-based for MRI) significantly improves sensitivity and specificity in detecting inflammatory lesions, abscesses, parasitic cysts, or neoplastic growths (ACR Appropriateness Criteria®, Infection and Inflammation). By consistently withholding contrast, hospitals ensured that Plaintiff's imaging studies remained inconclusive or falsely normal, thereby reinforcing dismissive narratives rather than identifying pathology.

**These repeated denials represent a dual failure of duty:**

Failure of diagnostic diligence – Basic laboratory evaluations, universally recommended by CDC and standard infectious disease guidelines, were never attempted.

Active medical indifference – Even when Plaintiff fabricated benign histories or used alternative names to bypass bias, facilities abandoned appropriate treatment plans once Plaintiff was identified, suggesting coordinated suppression rather than independent medical judgment.

The cumulative effect of these denials has been to perpetuate untreated medical conditions, to reinforce the appearance of psychiatric rather than medical pathology, and to conceal objective evidence that would otherwise corroborate Plaintiff's claims. This pattern constitutes not only negligence but also deliberate indifference under constitutional standards (see Estelle v. Gamble, 429 U.S. 97 (1976), holding that deliberate indifference to serious medical needs violates the Eighth and Fourteenth Amendments).

### TECHNICAL & SCIENTIFIC CONTEXT SUPPORTING ALLEGATIONS

#### 1) Aerosol/Particulate Exposure Consistent with Reported Symptoms

Mechanism of exposure. Fine and ultrafine particles ($PM_{2.5}$ and smaller) can remain airborne, travel through HVAC ductwork, and deposit deep within the lungs and olfactory pathways. Professional standards emphasize that ventilation, high-efficiency filtration (MERV-13/14+), and air cleaning materially change exposure risk—i.e., poorly configured HVAC can facilitate distribution rather than removal. ASHRAE+1

Health effects consistent with Plaintiff's reports. Short-term $PM_{2.5}$ exposure is associated with decreased attention and cognitive performance within hours, along with cardiopulmonary irritation—symptom clusters the Plaintiff describes (confusion, weakness, chest discomfort). Broader epidemiology links $PM_{2.5}$ with arrhythmias, reduced lung function, and breathing difficulty—heightened risks for people with pre-existing heart disease. US EPA+1Nature

Real-world plausibility. Even everyday indoor sources (e.g., candles, cooking) can impair selective attention after brief exposures in unventilated rooms—supporting the basic principle that indoor airborne particulates can quickly alter cognition and well-being. The Times

Discovery/Testing Requests: HVAC service logs; make/model and MERV ratings of installed filters; records of any chemical/particulate systems added to Plaintiff's vehicle HVAC;

third-party air sampling (PM$_{2.5}$/PM$_1$, VOCs) of vehicles/rooms; wipe sampling of vents and filters; chain-of-custody for all samples.

----------------------

### 2) Diagnostic CT Radiation vs. Antiparasitic Claims

Dose reality. Typical diagnostic CT delivers millisievert (mSv)-level doses: ~2 mSv (head), ~7–10 mSv (chest), and up to 10–30 mSv for multiphase abdomen/pelvis—orders of magnitude below levels used to sterilize biological organisms. PMCCancer.govRadiologyinfo.org

Sterilization doses are kilogray. To inactivate microbes/parasites in food, ionizing radiation in the range of ~2–7 kGy (thousands of gray) is referenced—millions of times higher than diagnostic CT. Thus, CT is not expected to kill parasites; observed material after scans likely reflects mucosal irritation, pre-existing debris, or unrelated **epistaxis triggers rather than radiation-induced organism death. U.S. Food and Drug Administration+1**

Nosebleeds have common non-radiation causes. Medical references list local irritation/dryness, hypertension, coagulopathy/medications, or trauma as common causes of epistaxis; CT itself is not a recognized proximate cause. Merck Manuals+1MSD Manuals

Discovery/Testing Requests: Full DICOM imaging with dose reports (CTDIvol, DLP); treating-provider notes stating clinical purpose of each scan; ENT exam findings; coagulation labs; environmental irritant logs; stool O&P, antigen, and PCR panels (see §4).

----------------------

### 3) "Saline" (0.9% Sodium Chloride) Injections During Holds

What saline is (and isn't). Normal saline is an isotonic crystalloid (0.9% NaCl). It does not treat parasitic disease or chemical intoxication. In people with heart failure, unnecessary or excessive saline can worsen edema and cardiopulmonary status, so indication and informed consent matter. NCBI

Medication during involuntary evaluation. Under California WIC §5150 and Nevada NRS 433A, facilities may evaluate and medicate during a 72-hour crisis hold; continuing detention requires procedural protections (petition/hearing or voluntary status). This makes documentation and consent records pivotal to determine whether injections were clinically indicated or coercive. FindlawJustia LawDisability Rights CaliforniaNVBH.org

Discovery/Testing Requests: MARs (Medication Administration Records), lot numbers, composition testing (retain sample/line if available), informed-consent forms or emergency exception notes, vitals before/after injections, and attending-physician rationale.

----------------------

### 4) Parasitology: Appropriate Diagnostics vs. Dismissal

Standard clinical confirmation. Suspected parasitic disease is laboratory-diagnosed, not inferred from CT. CDC-recognized methods include stool ova & parasite (O&P) examinations, concentration techniques, antigen assays, and PCR; multiple specimens on separate days increase yield. CDC+1

Corroborating exams. Where nasal involvement is alleged, ENT nasal endoscopy and microscopy/PCR of specimens are appropriate. Chain-of-custody should be maintained for any retrieved material from vehicles, hotel rooms, or air filters to avoid spoliation challenges.

Discovery/Testing Requests: Orders/results for O&P x3, antigen/PCR results, endoscopy reports, pathology photos, and lab QA logs; request independent reference-lab retesting if prior testing is incomplete or missing.

----------------------

### 5) Cardiovascular Risk from Delayed Care (Vehicle Seizures)

For individuals with pre-existing heart disease, delays in access to emergency care increase risks of arrhythmia, myocardial injury, or sudden death. EPA and health-agency guidance also notes PM exposure can trigger cardiac events and irregular heartbeat, compounding risk when transportation is removed. This supports the allegation that impoundments leveraged medical vulnerability to coerce/terrorize. US EPA

----------------------

6) How the Science Interlocks With the Alleged Scheme

HVAC & particulate physics make environmental contamination of cars/rooms technically feasible; cognitive and cardiopulmonary effects are consistent with PM exposure literature. ASHRAE+1US EPA

CT scans at diagnostic doses cannot plausibly "kill parasites"; if staff repeatedly pivoted away from objective lab diagnostics toward psychiatric labels while giving non-therapeutic saline, that divergence itself is provable via records and supports a theory of medical gaslighting/obfuscation rather than treatment. PMCU.S. Food and Drug Administration

72-hour hold laws in CA/NV explain the legal context for involuntary meds; your claim focuses on misuse of those authorities. Paper trails (orders, MARs, consent, progress notes) will reveal whether standards were met. FindlawJustia Law

----------------------

### RELIEF & DISCOVERY—SCIENCE-FOCUSED ORDERS THIS HONORABLE COURT CAN REFERENCE

Spoliation-prevention order covering vehicles, HVAC components, filters, hotel rooms, and hospital records/line sets.

Forensic environmental testing (independent lab) of vents, filters, upholstery, and swabs for PM profile, fibers/biologic material, and chemical residues; require chain-of-custody.

Medical audit: compel production of complete EMR, MARs, CT dose reports, and communications between hospital risk management and named Defendants.

Compelled diagnostic testing: O&P x3, antigen/PCR, CBC/eosinophils, IgE, and targeted toxicology; ENT evaluation with documentation. CDC

HVAC engineering review (vehicle & hotel): filter ratings, maintenance logs, and any retrofits; deposition of engineers/technicians who accessed systems. ASHRAE

--------------

### G. Defamation and Media Campaign

MGM Resorts International, in coordination with co-Defendants including Berkshire Hathaway, Amazon, and various local actors, engaged in a systematic campaign of defamation and media manipulation aimed at destroying the Plaintiff's reputation. This included:

2. The dissemination of defamatory broadcasts through both traditional and digital media platforms.

3. The circulation of unfounded rumors and fabricated narratives within the Plaintiff's residential community.

4. The active use of online platforms, including those maintained or facilitated by Amazon To act as an employee to attempt to conceal identities, as well as police agencies giving media outlet a call and report a arrest to be publicized to spread false claims portraying Plaintiff as violent, unstable, or deceitful.

These campaigns were not isolated incidents but part of a broader, coordinated effort. Studies in the field of communication sciences indicate that when individuals are repeatedly exposed to false information, it can lead to what are known as "illusory truth effects." In this phenomenon, people start to perceive false claims as true, even when they are aware that the statements are not factual (see Fazio, Brashier, Payne, & Marsh, "Illusory Truth Effect: Repetition Increases Perceived Truth Even for Known Falsehoods," Journal of Experimental Psychology, 2015). By exploiting these psychological tendencies towards persuasion, the Defendants intentionally eroded the Plaintiff's reputation within his community and the judicial system.

### The repercussions of these defamatory efforts were drastic:

The Plaintiff's credibility faced systematic assaults, resulting in situations where judges, law enforcement officials, and potential witnesses disregarded or doubted the Plaintiff's claims.

Both the Plaintiff's professional and personal reputation suffered significant harm, which negatively affected his chances of obtaining fair legal proceedings, job opportunities, and impartial medical treatment.

Additionally, the false narratives fostered a biased atmosphere that skewed the perspectives of judges, police officers, and community members against the Plaintiff before any proper examination of the facts took place.

Such actions constitute defamation per se, as they directly accuse the Plaintiff of criminal activity, mental instability, and dishonesty—elements that U.S. law has long acknowledged as inherently defamatory (see Restatement (Second) of Torts § 570; see also Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)).

Furthermore, the engagement of large corporate media platforms and established financial entities, such as the resources of MGM and the affiliated outlets of Berkshire Hathaway, highlights that the defamatory campaign was both deliberate and well-financed, orchestrated across various means of communication, thereby amplifying its damaging effects.

----------------------

### I. Concealment and Obstruction Will Show Mala Prohibitum

Defendants engaged in a deliberate and systematic campaign to destroy, conceal, or manipulate evidence that would have exonerated Plaintiff and demonstrated the unlawful nature of Defendants' conduct. These acts of obstruction were not isolated but part of a coordinated effort across multiple jurisdictions and entities, carried out with the intent to deprive Plaintiff of his constitutional rights, obstruct justice, and shield Defendants from accountability.

Defendants' tactics included, but were not limited to: failing to disclose exculpatory evidence, altering or "losing" critical records, destroying recordings, and mischaracterizing incidents in official reports. By distorting the evidentiary record, Defendants manufactured a false narrative that portrayed Plaintiff as a criminal actor rather than the victim of ongoing conspiratorial misconduct.

Plaintiff, despite these systemic obstructions, has independently preserved crucial evidence in his possession, including audio recordings, photographs, medical documentation, and witness statements. This evidence directly supports Plaintiff's claims of unlawful surveillance, poisoning, harassment, defamation, and malicious prosecution.

Plaintiff hereby demands that all Defendants preserve without alteration or destruction all evidence in their custody, control, or possession relevant to this case, including but not limited to:

Body-worn camera recordings of all police interactions with Plaintiff;

Dash camera footage;

911 call recordings, transcripts, and dispatch logs;

Internal communications, including text messages, emails, and memoranda;

Surveillance video from cooperating businesses or institutions;

Arrest, booking, and incident reports;

Any audio, video, or photographic evidence documenting Plaintiff's movements, property, or alleged conduct.

Plaintiff places Defendants on formal notice of their legal duty to preserve such evidence under the Federal Rules of Civil Procedure. Federal courts have consistently held that when law enforcement fails to preserve evidence that is material to a defendant's or plaintiff's claims, such failure constitutes spoliation and warrants sanctions, including adverse inference instructions in favor of the aggrieved party.

In Arizona v. Youngblood, 488 U.S. 51, 58 (1988), the Supreme Court recognized that the destruction or loss of potentially exculpatory evidence by law enforcement violates due process where done in bad faith. Similarly, in Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003), the court held that failure to preserve relevant evidence justifies sanctions up to and including adverse inference instructions. In Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993), the Ninth Circuit confirmed that spoliation of evidence raises a presumption that the destroyed evidence would have been unfavorable to the party responsible.

These precedents make clear that if Defendants fail to produce or have destroyed body camera footage, 911 recordings, dispatch logs, or other critical evidence that is procedurally required to exist under law enforcement protocols, the Court must construe the missing evidence as supporting Plaintiff's version of events. Accordingly, Plaintiff respectfully submits that the absence of such evidence should be deemed proof of the unlawful acts alleged herein.

### COUNTS AND CAUSES OF ACTION

Count 1 – The first set of allegations is filed under the federal law 42 U.S.C. § 1983, where it is claimed that there have been unlawful detentions of individuals, excessive force has been employed by law enforcement, individuals have faced retaliation for asserting their rights, and there have been infringements upon their due process rights.

Count 2 – The second set of claims falls under 42 U.S.C. § 1985, which addresses conspiracies that aim to obstruct and impede individuals from exercising their civil rights.

 Count 3 – This count is based on the California Bane Act, which is codified as Cal. Civ. Code § 52.1, and includes assertions regarding violations of civil rights.

 Count 4 – Here, the issues pertain to wrongful arrest and false imprisonment, indicating that individuals were detained unjustly without legitimate reason.

 Count 5 – The actions described are related to conversion and trespass to chattels, meaning there has been wrongful interference with personal belongings or property through illegal seizures.

Count 6 – The focus of this claim is on the intentional infliction of emotional distress, where the actions of particular individuals or entities have led to significant emotional suffering.

 Count 7 – In this section, claims of negligence and negligent supervision are raised, particularly in relation to municipal liability, pointing to possible lapses in proper conduct or oversight by public officials or entities

. Count 8 – This part addresses the abuse of process, implying that legal procedures were manipulated to serve hidden agendas not intended by the legal framework.

Count 9 – The claims of medical negligence and deliberate indifference spotlight failures in the duty of care, particularly in responding to the medical requirements of individuals.

Count 10 – There are allegations of defamation, libel, and slander, which assert damage to an individual's reputation through untrue statements.

Count 11 – In conclusion, this count seeks both declaratory and injunctive relief, aiming for legal remedies that would clarify or uphold rights and prevent further harm from occurring.


----------------------

### IX. COMPENSATION FOR LOSS OR HARM
Plaintiff seeks the following relief as a direct result of the unlawful and malicious acts committed by Defendants, both jointly and severally, under color of law and in conspiracy with private actors:

1. **Compensatory Damages** – Plaintiff demands the sum of **Thirty Million Dollars ($30,000,000.00)** to compensate for the extensive losses and hardships suffered, including but not limited to:
   Loss of income and financial opportunities;
   Deprivation of property and professional tools necessary for livelihood;
   Emotional distress, humiliation, and reputational harm;
   Physical and psychological suffering caused by harassment, unlawful seizure, and excessive force.

2. **Punitive Damages** – Plaintiff further seeks **One Billion Dollars ($1,000,000,000.00)** in punitive damages. This extraordinary award is warranted in light of the egregious, malicious, and willful misconduct of Defendants, whose coordinated actions were designed to permanently destabilize Plaintiff's life, finances, liberty, and family security. Such damages are necessary not only to punish the wrongful conduct but also to deter Defendants and similarly situated actors from engaging in such unlawful schemes in the future.

3. **Attorney's Fees and Costs** – Pursuant to **42 U.S.C. § 1988,** Plaintiff demands full reimbursement of reasonable attorney's fees, litigation costs, and related expenses incurred in the prosecution of this action. This ensures Plaintiff's right to meaningful access to justice and prevents further compounding of financial harm caused by Defendants' actions.

4. **Additional Relief** – Plaintiff also seeks any other relief deemed just, proper, and equitable by this Court, including but not limited to injunctive relief preventing Defendants from further engaging in unlawful surveillance, harassment, and interference with Plaintiff's property and livelihood.

----------------------

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, and grant the following relief:

1. **Compensatory Damages** – Award Plaintiff the sum of **Thirty Million Dollars ($30,000,000.00)** as compensation for the extensive losses and hardships suffered, including but not limited to:
   Loss of income and financial opportunities;
   Deprivation of property and professional tools necessary for livelihood;
   Emotional distress, humiliation, and reputational harm;
   Physical and psychological suffering caused by harassment, unlawful seizure, and excessive force.

2. **Punitive Damages** – Award Plaintiff **One Billion Dollars ($1,000,000,000.00)** in punitive damages, in light of the egregious, malicious, and willful misconduct of Defendants, whose coordinated actions were designed to permanently destabilize Plaintiff's life, finances, liberty, and family security. Such an award is necessary to punish Defendants' conduct and to deter Defendants and similarly situated actors from engaging in such unlawful schemes in the future.

3. **Attorney's Fees and Costs** – Pursuant to **42 U.S.C. § 1988,** award Plaintiff full reimbursement of reasonable attorney's fees, litigation costs, and related expenses incurred in the prosecution of this action, ensuring Plaintiff's meaningful access to justice.

4. **Injunctive and Equitable Relief** – Issue injunctive relief requiring:
   The **immediate and safe return of Plaintiff's kidnapped cat;**
   The **return of Plaintiff's vehicle unlawfully seized and wrongfully withheld by Defendants;**
   An order prohibiting Defendants from further engaging in unlawful surveillance, harassment, interference with Plaintiff's property, or acts designed to deprive Plaintiff of family, companion animals, or essential property necessary for livelihood.

5. **Additional Relief** – Grant such other and further relief as this Court deems just, proper, and equitable.

----------------------

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims.

## --- DECLARATION

-----I YOUSEF KADMIRI HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOIGN BE TRUE
ACCURATE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

\\

*Yousef E Kadmiri*